**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                     CRIMINAL ACTION NO. 2:16-cr-00158

BLAINE JEROME IVERY,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Defendant's Motion to Suppress Statements, (ECF No. 16), and First Motion in Limine,[1] (ECF No. 21).   For the reasons stated herein, the motion to suppress is **DENIED**, and the motion in limine is **GRANTED IN PART** and **DENIED IN PART**.

*I.   BACKGROUND*

Defendant Blaine Ivery is named in a two-count indictment charging him with knowingly and intentionally distributing a quantity of heroin in violation of 21 U.S.C. § 841(a)(1).   (ECF No. 1.)   Defendant's motion to suppress was filed on October 3, 2016, (ECF No. 16), and the Government filed its response on October 19, 2016.   (ECF No. 24.)   Defendant later filed his motion in limine on October 7, 2016, (ECF No. 21), and the Government's response was filed on October 19, 2016.   (ECF No. 25.)   The Court held a pretrial motions hearing on October 24, 2016, where the parties presented evidence and argument concerning the admissibility of various

---

[1] Defendant also filed a Motion Reserving the Right to File More Motions, (ECF No. 17), and a Motion to Accept Defendant's Motion in Limine Out of Time, (ECF No. 20).   The Court **GRANTS** both of these unopposed motions.

statements made by Defendant and the matters addressed in the motion in limine.   (ECF No. 35.)

The following facts were derived from the testimony and exhibits adduced during that hearing.[2]

The indictment stems from two alleged drug transactions, the first occurring on April 27,

2016, and the second on June 3, 2016.   These instances, which allegedly took place in South

Charleston, West Virginia, are the subject of two purported drug buy videos admitted into evidence

at the pretrial hearing.   (*See* ECF Nos. 39-1.)   Detective Michael Lester, who testified at the

hearing, is employed by the Dunbar Police Department and is a member of the Metropolitan Drug

Enforcement Network Team ("MDENT").   Detective Lester drove the CI to the site of the alleged

drug buys.   He is seen at the beginning and end of both videos placed on the record at the hearing.

(*Id.*)   A West Virginia State Police Forensic Laboratory Report ("the lab report") indicates

analysis of the contents of two plastic bags received on July 28, 2016—one weighing 0.562 gram

and the other 0.440 gram.   (ECF No. 39-2.)   The lab report indicated the presence of heroin and

fentanyl in the first bag and heroin in the second.   (*Id.*)

Detective Lester, accompanied by Detective Daniel Johnson, executed a warrant and

arrested Defendant on June 14, 2016, at a halfway house in St. Albans, West Virginia, for the

charges outlined in the indictment.   Detective Lester transported him in the front seat of an

unmarked, undercover vehicle.   Detective Lester testified at the hearing that Defendant was

cooperative during this process.

Detective Lester transported Defendant from the halfway house, Dismas Charities, to the

Charleston Police Department for processing.   During the initial transport and without giving

---

[2] The facts are based on a rough draft of the hearing transcript, and accordingly include no direct citations.   The parties are encouraged to request an official transcript from the court reporter should they desire to review any testimony or statements from that hearing.

Defendant his *Miranda* rights, Detective Lester made small talk with Defendant—he asked Defendant whether Defendant had been arrested previously on a drug charge and what was the previous charge.   Defendant was quiet for a majority of the drive until a section of MacCorkle Avenue in South Charleston when Defendant allegedly said, while looking out the window, "I can't believe somebody would do this to me knowing I'm at the halfway house."   Detective Lester testified that Defendant's statement was not in response to a question asked or statement made, and Detective Lester stated that he did not respond.

Detective Lester continued driving from MacCorkle Avenue in South Charleston onto Interstate 64.   Within a short period of time from the first statement, Defendant allegedly made a second statement to the following effect: "Well, I guess that's what I get for middle manning it." Detective Lester testified that this statement by Defendant was not in response to a question asked or statement made by Detective Lester, and Detective Lester stated that he did not respond to it.

As they were traveling along the interstate after passing the Montrose Drive exit, Defendant asked Detective Lester what they were doing.   Detective Lester responded and explained that they were heading to the Charleston Police Department for processing before traveling to Kanawha County Courthouse for arraignment where Defendant would be given a preliminary hearing date within the next ten days.   Upon this information, Defendant allegedly asked Detective Lester, "Is that when I'll find out who told on me?"   Detective Lester testified that he did not ask Defendant a question before that statement, but he responded to Defendant's question with something along the lines of "no, not at that time.   It's just a preliminary."

After Defendant's arraignment at the Kanawha County Courthouse, Detective Lester transported Defendant in the front seat of the same unmarked vehicle to South Central Regional

Jail.   They were traveling on Route 119 when Detective Lester stopped the car at a red light.   A vehicle pulled along the right side of the car, and Defendant allegedly raised his hands to show the driver of that vehicle that he was handcuffed before saying, "Someone told on me."   Defendant now seeks to suppress the admission of these statements and other pieces of evidence outlined in the motion in limine and argued at the pretrial hearing.

## II.   *LEGAL STANDARD*

"The burden of proof is on the party who seeks to suppress the evidence."   *United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2104) (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)).   If the defendant provides a basis for the motion to suppress, the burden shifts to the prosecution to prove the challenged evidence's admissibility by a preponderance of the evidence.   *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).   "Where a defendant seeks to suppress a statement under *Miranda v. Arizona*, 384 U.S. 436 (1966), the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings."   *Hunter*, 63 F. Supp. 3d at 619 (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Matlock*, 415 U.S. at 178).   During a pretrial hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge."   *Id.* (quoting *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993)) (internal citation omitted).   *See also Columbus-Am. Disc. Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) ("[I]n the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence.

Evaluation of the credibility of a live witness is the most obvious example." (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 623 (1993))).

## III.  DISCUSSION

### A.  Motion to Suppress Statements

The Fifth Amendment of the U.S. Constitution protects criminal suspects from being compelled to make incriminating statements against themselves.  *See* U.S. Const. amend. V.   To this end, *Miranda v. Arizona* lays out four core warnings that must be given to criminal suspects under certain circumstances: (1) the right to remain silent; (2) that anything the suspect says can and will be used against him or her in a court of law; (3) the right to an attorney; and (4) that an attorney will be appointed if he or she cannot afford one.  *See* 384 U.S. at 444–45.   These rights are implied rights grounded in the Fifth Amendment's Self-Incrimination Clause.  *See id.* at 468–69.   Two core requirements dictate when *Miranda* warnings are necessary: (1) the suspect must be in custody of law enforcement, and (2) the suspect must be under interrogation.  *See United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007) (providing that custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way").

Further, the Fifth Amendment *Miranda* doctrine defines interrogation as any conduct a police officer knows or should know is likely to elicit an incriminating response.  *See id.* at 324–25.   The Supreme Court has broadened the concept of interrogation to include conduct beyond actual questioning by police.  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (expanding "interrogation" to include either "express questioning or its functional equivalent").   "The Court

5

in *Innis* defined the functional equivalent of questioning as "any words or actions *on the part of police* (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."   *Kimbrough*, 477 F.3d at 147 (quoting *Innis*, 446 U.S. at 301 (emphasis added)).   Whether the police should know that an incriminating response is likely to be elicited "focuses primarily upon the perceptions of the suspect, rather than the intent of the police."   *Id.* (quoting *Innis*, 446 U.S. at 301).

*Miranda* does not apply to incriminating statements made spontaneously because such statements are not the product of interrogation.   *See id.* at 147 (citing *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)) (noting that "[i]f the suspect is not subjected to 'official' interrogation . . . the Fifth Amendment is not implicated").   The Fourth Circuit observed that "as *Miranda* and its progeny make plain, confessions given freely and without compelling state influences are admissible and indeed, desirable."   *Kimbrough*, 477 F.3d at 149–50 (citing *Arizona v. Mauro*, 481 U.S. 520, 529 (1987)).   In determining a statement's voluntariness, the court must consider the totality of the circumstances, "including the characteristics of the defendant, the setting of the interview, and the details of the interrogation."   *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (citations omitted).   The voluntariness of a statement is determined through the lens of the Due Process Clause: "whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'"   *United States v. Braxton*, 112 F.3d 777, 780–81 (4th Cir. 1997) (citation omitted).   The Fourth Circuit has provided:

> The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary.   The proper inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'"   Any

6

statement given freely and voluntarily without any compelling influences is admissible in evidence.

*Id.* (quoting *Pelton*, 835 F.2d at 1071 (internal citation omitted)).

Defendant claims that all of the statements he allegedly made on June 14, 2016, "were not spontaneous utterances; to the extent uttered at all, they were instead the product of custodial interrogation." (ECF No. 16 at 1–2.) Thus, Defendant argues, he "should have been advised of his *Miranda* rights." (*Id.* at 2.) The Government argues that "the statements were made voluntarily and not in response to any interrogation," which means that *Miranda* is not implicated and the statements are admissible. (ECF No. 24 at 2.) The Government claims that "[t]he only questions uttered were questions from the defendant. The statements of the officer were made in response to defendant's questions to briefly explain the processing procedure and subsequent hearings, and were not questions or otherwise intended to elicit incriminating responses." (*Id.* at 3.)

The parties agreed at the pretrial motions hearing that the only disputed issue is whether Defendant was subjected to the functional equivalent of interrogation at the time he made the alleged statements. It is undisputed that Defendant was in custody at all relevant times. The Government admits that Defendant was not *Mirandized* before the statements were made, and Defendant's argument at the hearing focused on the ease with which Detective Lester could have read Defendant his *Miranda* rights. However, the law only contemplates the factual scenarios in which *Miranda* rights must be read—not how easy it would be to do so.

If the functional equivalent of interrogation exists within these alleged facts, then it arose when Detective Lester answered Defendant's procedural question during the drive to the

7

Charleston Police Department for processing.[3]   Detective Lester testified that Defendant's statements were not preceded by a question asked or statement made by Detective Lester. Detective Lester's answer to Defendant's question regarding what they were doing could have prompted Defendant's question about when he would find out who informed on him, but the Court finds that this does not amount to the functional equivalent of interrogation.   While Defendant sat in the front seat of the car, he was handcuffed and aware that he was being transported to the police department, the courthouse, and, eventually, South Central Regional Jail.   The statements allegedly made by Defendant were spontaneous and were not the result of any questions asked by Detective Lester.   Besides the fact that Detective Lester answered Defendant's question about the procedural aspects of his arraignment, the two were not engaged in any meaningful conversation, and, notably, did not talk about Defendant's conduct leading to the instant offense.   Neither case law nor common sense supports the notion that an officer's silence or simple answer to a suspect's unprompted question is reasonably likely to elicit an incriminating response from a suspect. Based on his testimony, Detective Lester should not be held to expect an impulsive incriminating response in this situation.   Defendant's statements were freely and voluntarily given in light of the factors discussed above, and they are admissible.   As such, there is no basis to suppress the statements allegedly made by Defendant on June 14, 2016.

---

[3] The Court notes that Detective Lester testified at the pretrial hearing that after placing Defendant in the front seat of the car and beginning the drive to the Charleston Police Department, Detective Lester asked Defendant if he had ever been arrested on a drug charge and what that charge was.   Detective Lester testified that Defendant was quiet after that brief exchange.   Some time passed between this initial discussion and Defendant's first statement about not believing that somebody would do this to him knowing that he was at a halfway house.   Further, Defendant does not challenge any statement as being elicited by this small talk.   Due to the passage of time and the brief nature of the talk, the Court does not find that the exchange occurring at the start of the drive can be considered the functional equivalent of interrogation.   *See Innis*, 446 U.S. at 302–03 ("This is not a case where the police carried on a lengthy harangue in the presence of the suspect.   Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly 'evocative.'").

B.   *Motion in Limine*

In his First Motion in Limine, Defendant seeks exclusion at trial of evidence of or reference to a list of matters which will be addressed below.

For the reasons stated at the October 24, 2016, hearing, the Court **DENIES AS MOOT** the motion insofar as it seeks exclusion of: (1) Defendant's prior convictions; (3) Federal Rule of Evidence 404(b) evidence; (4) police incident reports; (5) police line-up or booking photographs; (6) lay opinion testimony of law enforcement officers; (8) field tests that tested positive for heroin; (9) buy money; (11) post arrest statements; (12) purported observations of officers surveilling the CI; and (13) CI testimony. The following discussion pertains to Defendant's motion in limine as it seeks to exclude evidence of or reference to Defendant's placement in a halfway house, evidence of or reference to fentanyl, and videotape recordings of purported drug buys, as discussed at the pretrial hearing.

Defendant argues that this potential evidence is irrelevant and/or unduly prejudicial.   The federal evidentiary rules governing relevance are succinctly stated: Relevant evidence means evidence having "any tendency to make a fact more or less probable than it would be without the evidence," given that "the fact is of consequence in determining the action."   Fed. R. Evid. 401. "Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible."   Fed R. Evid. 402.   Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.

"[R]elevance typically presents a low barrier to admissibility." *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003). Absent limited exceptions under other rules, "to be admissible, evidence need only be 'worth consideration by the jury,' or have a 'plus value.'" *Id.* (quoting *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997) (internal quotation marks omitted)). "Once evidence has been shown to meet the low threshold of relevance, however, it presumptively is admissible" unless excluded by one of the sources listed in Federal Rule of Evidence 402. *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 541 (D. Md. 2007) (citing Fed. R. Evid. 402). "When a harmful component of relevant evidence becomes unduly prejudicial, a court should exclude it from consideration by the jury." *Smithfield Foods, Inc. v. United Food & Comm. Workers Intern. Union*, 586 F. Supp. 2d 632, 635 (E.D. Va. 2008). In the Fourth Circuit, "'undue prejudice' is defined as 'a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.'" *Id.* (citing *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993) (citation omitted)). When analyzing whether evidence may be unduly prejudicial, "the balance under Rule 403 should be struck in favor of admissibility." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996).

1. <u>Halfway House</u>

Defendant moves to exclude information regarding his placement in a halfway house while serving a prior federal sentence. (*See* ECF No. 21 at 2.) The charged offense conduct allegedly occurred while Defendant was staying in a halfway house, and he argues that facts related to his stay there or his prior federal sentence "are not probative on any element of Mr. Ivery's pending charges" and are not relevant.[4] (*Id.*) The United States' response indicates that it "does not

---

[4] The Court notes that at the pretrial hearing, Defense counsel also argued that one of Defendant's statements made while in custody was related to the halfway house, and Defendant moves to exclude this as well. However, the Court

intend to introduce any such evidence in its case-in-chief."   (ECF No. 25 at 2.)   The Government reserved the right, however, to use evidence related to the halfway house for cross examination or impeachment purposes.   (*See id.*)   Because the prosecution does not intend to use evidence of Defendant's stay at the halfway house in its case-in-chief, the Court **DENIES AS MOOT** the motion insofar as it seeks exclusion at trial of the details of Defendant's placement at a halfway house and his prior 2015 federal sentence as substantive evidence.   However, the Court **DEFERS** until trial a ruling on whether the prosecution may use such evidence as impeachment evidence on cross-examination of Defendant.

2.   Fentanyl

Defendant moves to exclude any mention of fentanyl, which was included as part of purported field tests of what was sold as heroin on June 3, 2016, and listed in an MDENT report produced by the Government.   (ECF No. 21 at 3.)   Defendant argues that because he is charged with distribution of heroin, any mention of fentanyl by the Government or its witnesses is irrelevant and prejudicial.   (*See id.* at 3–4.)   Defendant's counsel stated at the pretrial hearing that he did not believe that an ancillary amount of fentanyl, a Schedule II controlled substance, makes it more likely than not that Defendant distributed heroin, which is a Schedule I controlled substance. Defendant also stressed at the pretrial hearing that referencing fentanyl would be especially prejudicial to the jury given the substance's vast and recent coverage in the local media.   The Government notes its submission of the West Virginia State Police Laboratory Report indicating the presence of heroin and fentanyl in one of the two samples allegedly taken from the controlled

---

analyzed that statement in the discussion on Defendant's Motion to Suppress Statements, and that analysis will not be rehashed here.   If the statement survives the motion to suppress, then it may be admitted at trial as a statement by party opponent under Federal Rule of Evidence 802(d)(2).

buys.  (ECF No. 25 at 3.)   Further, the prosecution indicated its intent to call a forensic analyst from the laboratory and stated that the witness "should be permitted to discuss the entirety of the results of the testing set forth in the laboratory report, including the presence of fentanyl."   (*Id.*)

The Fourth Circuit has held that laboratory reports prepared by a forensic analyst are considered testimonial statements and, thus, hearsay.  *See United States v. Simmons*, 773 F.2d 1455, 1458–59 (4th Cir. 1985); Fed. R. Evid. 803.   These forensic reports, providing analysis of drugs central to a criminal investigation, are clearly offered to prove the truth of the matter asserted. *See Williams v. Illinois*, 132 S. Ct. 2221, 2232–33 (2012).   The admissibility of hearsay under one of the rule's exceptions is "permissive and not mandatory, with admissibility or non-admissibility resting within the discretion of the trial court."   *See United States v. Gray*, 852 F.2d 136, 139 (4th Cir. 1988).

While the lab report is hearsay, the Government may call a proper witness to testify as to the contents of that report.   Regardless of the lab report's admissibility, the Court finds that any mention of fentanyl within the lab report or by an expert witness is not relevant to the instant offense.   Certainly, the identification of a controlled substance that a defendant is accused of distributing is probative of the fact that the defendant distributed that substance.   *See United States v. Albritton*, 583 Fed. App'x 107, 109 (4th Cir. 2014).   However, the Court does not view the identification of another controlled substance—of which Defendant is not charged with distribution—to be probative of any fact of consequence.

 The lab report admitted as Defendant's Exhibit 1 at the pretrial hearing, (ECF No. 39-2), analyzes the two substances obtained during the controlled buys.   Because Defendant is charged with distribution of heroin arising out of these controlled buys, the contents of the lab report are

relevant to show that Defendant distributed a controlled substance and that the controlled substance was heroin.   An indication of another drug's presence does not make it more or less likely that Defendant distributed heroin.   While the Government indicated at the pretrial hearing its desire to preserve the right to call a forensic analyst who would testify in its case-in-chief as to the lab report, the witness cannot be given free rein to discuss matters irrelevant to the instant offense of conviction.   Any discussion of fentanyl in this case is irrelevant and should be excluded from evidence.

The Court's finding that the mention of fentanyl is not relevant under Federal Rule of Evidence 401 renders unnecessary a Rule 403 discussion.   However, the Court notes that while fentanyl has indeed generated some negative local media coverage of late, it is likely little worse, if at all, than the ubiquitous negative coverage of heroin.   For these reasons, the Court **GRANTS** the motion as it seeks to exclude any reference to fentanyl.

3.  Buy Videos

Lastly, Defendant moves to exclude from evidence reference to or admission of two video recordings that purportedly show drug transactions between Defendant and the CI.   (*See* ECF No. 21 at 6.)  Defendant claims that the videos are not probative of any element of the crime and "would more likely lead to juror bias, confusion, and unduly prejudice Mr. Ivery's ability to receive a fair trial" because they do not show the moment of exchange between Defendant and the CI of cash and/or drugs.   (*Id.*)   Additionally, Defendant states that the videos do not "memorialize any discernable verbal exchanges between the CI and Ivery that establish any drug transaction has occurred."   (*Id.*)   The prosecution responds that "[t]he weight of the evidence depicted on the buy videos should be determined by the jury in its consideration of the material," and thus the

Government should be able to introduce them in its case-in-chief.   (*See* ECF No. 25 at 4.)   While Defendant's counsel stated in the pretrial hearing that the videos do not show a drug transaction and cannot be fairly shown as such, the prosecution noted that Defendant can be positively identified in both videos and that it plans to present the corroborating testimony of the CI in the videos.   Thus, the Government argues that the evidence contains a question of weight as opposed to a question of admissibility.

At the October 24, 2016, hearing, Defendant tendered a copy of the two videos in question as Exhibit 2A.   (ECF No. 39-1.)   The first is a video and audio recording that purports to record the CI's controlled purchase of heroin from Defendant on April 27, 2016.   The second is a video and audio recording that purports to be a June 3, 2016, controlled purchase of heroin by the same CI from Defendant.   The videos were made with a device hidden on the CI.

The admission of a video recording requires a showing of authenticity and accuracy because a video recording cannot be entirely self-authenticating.   *See United States v. Roach*, 28 F.3d 729, 736 (8th Cir. 1994) (cited in *United States v. Horvwalt*, No. 93-5193, 1995 WL 478148, at *2 (4th Cir. Aug. 14, 1995)).   Federal Rule of Evidence 901(a) governs the standard for admission: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."

Upon authentication, courts have upheld the admission of video recordings despite poor quality, *see United States v. Webster*, 84 F.3d 1056, 1065 (8th Cir. 1996) (upholding the district court's admission of a video tape despite the facts that the camera's lens was partially obscured, the recording did not preserve all of the defendant's actions, and the audio track was less than

14

clear), an inaccurate time stamp, *United States v. Watkins*, 388 Fed. App'x 307, 312 (4th Cir. 2010), or irrelevant material.   *See United States v. Hicks*, 255 Fed. App'x 749, 751 (4th Cir. 2007) (upholding the district court's admission of a video tape despite the fact that it contained irrelevant material and noting that "the videotape remain[ed] relevant even if the cocaine base was not visible on the tape").   Recordings are also admissible even when incomplete—wherein only a portion of the pertinent activities are shown.   *See Webster*, 84 F.3d at 1065 (8th Cir. 1996).   The same general requirements of audibility applicable to sound recordings apply to the audio component of video recordings.   *See United States v. Wesley*, 417 F.3d 612, 620 (6th Cir. 2005); *United States v. Munoz*, 324 F.3d 987, 992 (8th Cir. 2003); *United States v. Bernal*, 884 F.2d 1518, 1523 (1st Cir. 1989).   A video remains admissible despite inaudible or incomplete audio unless the "defendant establishes that the unintelligible portions are 'so substantial, in view of the purpose for which the tape[ ] [is] offered, as to render the recording as a whole untrustworthy . . . ." *Webster*, 84 F.3d at 1065 (8th Cir. 1996) (quoting *United States v. Huff*, 959 F.2d 731, 737 (8th Cir. 1992) (internal quotation omitted), *cert. denied*, 506 U.S. 855 (1992)).

A review of the two video recordings reveals that Defendant's Exhibit 2B submitted at the pretrial hearing appears to accurately set out a timeline of the videos.   (ECF Nos. 39-1, 39-3.) Each video recording is approximately twenty minutes in length.   All but approximately a minute or two in each video is largely unhelpful footage of the CI walking around the ClearOn property in South Charleston to and from her meeting with the individual alleged to be Defendant.   The video camera appears to be attached to the CI and hidden by her clothing.   At a couple of points during the second video, the CI removes the camera and places it on a picnic table.   The camera

lens is sometimes obscured by her body or clothing and is often pointed at the ground or toward the sky.

While a male figure who may be identified as Defendant appears in both videos,[5] there is no video footage of the drug transactions—no money or drugs are visible.   The audio portion of the recordings is clear at times and inaudible at other times due to wind, muffled voices, or something rustling against the camera's microphone.   The vast majority of the audible portion of the recordings is not related to the transactions.   In the first video, however, quiet voices can be heard during the alleged transaction, and after the alleged buy takes place, the CI says, "You owe me ten," "thank you, babe," and, "see you tomorrow," while walking away.   In the second video, a muffled conversation can be heard during the alleged transaction, and the CI says, "Thanks for that," before walking away from the individual.   In both videos, the recording begins in Detective Lester's vehicle with him announcing the date and time and the target of the undercover transaction as Blaine Ivery.   Both videos also end with the CI getting back into Detective Lester's vehicle. At the end of the first video, a male voice in the back of the vehicle can be heard saying, "We need it all.   Every bit of it."

Based on this evidence, the Court finds that any partial unintelligibility is insubstantial and does not render the recording, as a whole, untrustworthy.   According to Defendant's exhibit, Detective Lester testified in front of the grand jury that both recordings show Defendant distributing a quantity of heroin to the CI.   (ECF No. 39-3 at 2, 3.)   The Court does not suggest that the videos explicitly show a drug transaction taking place in the sense that money and drugs can be seen changing hands, but the videos provide enough for a trier of fact to make inferences

---

[5] In the first video, his face can be seen at the 15:22 mark and in the second video at the 17:18 mark.

2:16-cr-00158   Document 43   Filed 02/24/17   Page 17 of 17 PageID #: 188

Case 2:16-cr-00158   Document 43   Filed 02/24/17   Page 17 of 17 PageID #: 188

as to the videos' footage.   Presumably, testimony of the CI and Detective Lester will lend clarity

to the parts of the recordings that are difficult to discern because of either inaudibility or obscured

views.   These witnesses should be available to Defendant for cross-examination on these issues,

and the trier of fact should have the opportunity to reach its own conclusions and decide how much

weight to afford the evidence.   Further, the Court does not find that the videos meet any standard

for exclusion under Rule 403.   Accordingly, Defendant's motion in limine insofar as it seeks to

exclude the video recordings is **DENIED**.

*IV.   CONCLUSION*

For the foregoing reasons, Defendant's Motion to Suppress Statements, (ECF No. 16), is

**DENIED**.   Further, Defendant's First Motion in Limine, (ECF No. 21), is **GRANTED IN PART**

and **DENIED IN PART**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel,

the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        February 24, 2017

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

17